Opinion issued June 28, 2007

















In The

Court of Appeals

For The

First District of Texas






NO. 01-04-00921-CV

__________


MARCIE M. MCCARTHY, Appellant


V.


WANI VENTURE, A.S., 

SUCCESSOR IN INTEREST TO 

NORGIPS USA, INC., Appellee






On Appeal from the 129th District Court

Harris County, Texas

Trial Court Cause No. 2001-21419






O P I N I O N

 Appellee, Wani Venture, A.S., successor in interest to Norgips USA, Inc.
(collectively "Norgips") filed a suit on a sworn account against several defendants,
alleging of fraud and seeking to pierce the corporate veil. As of the time of trial, all
of the original defendants had filed bankruptcy, had been severed out of the case, or
had been non-suited, with the exception of appellant, Marcie McCarthy. Following
a jury trial, the trial court rendered judgment against McCarthy for $669,957. 

 In six issues, McCarthy argues that (1) the trial court erred in submitting an
incorrect definition of "actual fraud" in the jury charge; (2) there is no evidence that
her company, Triple M Supply LLC, committed an actual fraud; (3) there is no
evidence to support the damages and attorney's fees award; (4) there is no evidence
or insufficient evidence that McCarthy caused Triple M Supply to be used to
perpetrate an actual fraud and did perpetrate an actual fraud upon Norgips, primarily
for her own direct personal benefit; and (5) the trial court erred in finding McCarthy
individually liable for the amounts that the jury found that Triple M Supply owed
Norgips. We affirm. Background 

Triple M Supply's Purchase Order

 Norgips, a Florida corporation, manufactures and sells wallboard, also known
as drywall or sheetrock. John Kingston, Norgips's president, testified that, in 2000,
there was a severe shortage of wallboard in the marketplace, and "people were
scrambling to try to find drywall any place in the world that they could in order to
supply the US production." Kingston hired Steven Klubak to be Norgips's general
manager and to monitor the Texas and Florida markets. Kingston explained that part
of the reason that he hired Klubak was because Klubak told him that "he had this
customer in Texas that was a big player that could help [Norgips] be a major factor
in the Texas market." The "big player" was Triple M Supply, LLC.

 Triple M Supply was a wallboard distributor owned, in three equal parts, by
Anthony Moschella, Michael Moschella (Anthony's brother), and Marcie McCarthy
(Michael's girlfriend). Triple M Supply completed Norgips's confidential credit
application, and it was agreed that Triple M Supply would be Norgips's sole
distributor in the east Texas market. Triple M Supply prepared a purchase order for
Norgips to ship approximately $1.8 milion of wallboard from Poland to the Port of
Houston. Once the shipment arrived, it was stored in a warehouse in the Port of
Houston, and Norgips would deliver the wallboard incrementally, in response to
individual invoices from Triple M Supply. Kingston testified that it was Norgips's
intention to hold Triple M Supply liable for the full amount of the purchase order. 
 The first delivery was placed in April 2000. Triple M Supply was slow in
making payments and, in October 2000, its $108,000 check was returned for
insufficient funds. Kingston testified that, after the check bounced, "the red flag went
up and we started having serious concerns as to whether or not we were going to get
the money that was due to us." Kingston testified that there was "constant
communication" between Klubak and Anthony Moschella regarding Norgips's
outstanding bills. After Norgips received a $66,000 check from Triple M Supply in
late October--$42,000 less than the amount owed from the bounced check, Kingston
asked Klubak to meet with Triple M Supply to review its accounts receivables. 
Kingston wanted Klubak to determine what payments were due to Triple M Supply
from its customers and to explore the likelihood of whether it could satisfy its debt
to Norgips. 

 In December 2000, Anthony Moschella provided Klubak with bookkeeping
records of Triple M Supply's accounts receivables. (1) From these records, Kingston
discovered that there were outstanding receivables for more than $500,000. He saw
that Triple M Supply's largest customer was JTMM Construction Company. (2) Based
on his review of these records, Kingston learned that Anthony Moschella, Michael
Moschella, and Marcie McCarthy had another business, Triple M Operating. Triple
M Supply had apparently stopped "invoicing" customers in July 2000, and Triple M
Operating had begun invoicing the customers who purchased Norgips's wallboard.
Kingston testified that he was alarmed to discover that "the people that we had our
contractual relationship with, Triple M Supply, was no longer distributing our board."
Instead, Triple M Operating was distributing the board. From the accounting records
provided to Norgips, there appeared to be no distinction between the various
companies. Kingston testified that this discovery "immediately raised a flag" because
it seemed as though Triple M Supply, which "owed a lot of money to a lot of people,"
was setting up new corporations in order to continue doing business. Kingston was
concerned because handwritten notes on the accounts receivables records led him to
believe that these were old debts that were not going to be paid. Kingston also
discovered that, during the time that it was Norgips's exclusive distributor, Triple M
Supply was actually selling a competitor's board, while Norgips's board sat in the
warehouse.

 In January 2001, Kingston and Klubak met with Anthony and Michael
Moschella in an attempt to determine whether Norgips was ever going to be paid. 
Anthony Moschella again provided a copy of Triple M Supply's bookkeeping records
of its accounts receivables. (3) This second set of records showed that, in the month
since the previous accounts receivables records had been provided to Norgips, Triple
M Supply had collected more than $50,000--none of which had been used to pay the
outstanding balance it owed to Norgips. Kingston testified that Anthony Moschella
reassured him and explained that "he had $470,000 of good receivables there that he
would expect to receive payment on." Anthony Moschella "pledged" the receivables
to Norgips. At that point, Triple M Supply owed Norgips $504,000. Kingston was
surprised to learn from Anthony Moschella at the meeting, however, that Triple M
Supply had collected $150,000 from sales of Norgips's wallboard but had diverted
those funds to Mexico to another of Anthony Moschella's business ventures. 

 Within a week of the meeting, a $71,170.87 check made out to Norgips from
Triple M Supply was returned for insufficient funds. Norgips's last delivery of
wallboard to Triple M Supply occurred in December 2000. Kingston testified that
Norgips sold $1,047,000 of wallboard to Triple M Supply. However, Triple M
Supply had paid Norgips only $504,800, and still owed Norgips $541,850. 

 In February 2001, Kingston was contacted by Leeland Dykes, a stock broker. 
Dykes explained that he had hired a private detective and had learned that Norgips
was owed a lot of money by Triple M Supply. Kingston flew to Houston to meet with
Dykes, and he was told that Klubak, who still worked for Norgips, and Anthony
Moschella had been trying to corner the wallboard market and drive up the price so
that they could sell it at a premium. Kingston learned that Klubak had been brokering
other companies' wallboard and had sold more than $500,000 of wallboard from
Shamrock, a Norgips competitor, while he was Norgips's general manager. Kingston
was told that Shamrock had been "stiffed" for $105,000 and had obtained a judgment
against Klubak for that amount. As soon as he returned from his meeting with Dykes,
Kingston fired Klubak. Shortly thereafter, Kingston discovered that there were three
UCC filings reflecting that all of the assets of Triple M Supply, Triple M Operating,
and JTMM had been pledged to creditors other than Norgips. These pledges were
contrary to Anthony Moschella's representations that the receivables were pledged
to Norgips and that he would formalize the assignment with a creditor's lien. 

Behind the Scenes

 The jury was presented with testimony and evidence at trial regarding several 
interrelated companies involved in this case, which were generally owned by the
same people. Based on our review of the record, this evidence may be summarized
as follows:


Full Name
Funded
Ownership
Caribe Forest Products,
Inc. ("Caribe")
(record is silent)

McCarthy non
passive investor
Marcie McCarthy, President

Michael Moschella,
Secretary/Treasurer
Caribe Forest Products,
I, Ltd. ("Caribe I")
(record is silent)
Marcie McCarthy, President

Michael Moschella,
Secretary/Treasurer
JTM Supply
McCarthy invested
$176,000
d/b/a JTMM 

JTMM Construction, Inc.

("JTMM")
McCarthy invested
$150,000 +
$215,000 two
months later
90% Anthony Moschella

5% Mando Moschella

5% E. Moschella 

K Cor Supply, LLC

("K Cor")
(record is silent)
100% Anthony Moschella 

M Global Shipping, LLC

("M Global")
(record is silent)

McCarthy non
passive investor
33.34 % Marcie McCarthy

33.33% Anthony Moschella

33.33% Michael Moschella
Triple M Operating, Ltd.
opened with
$600,000 loan
from Isle of Man;

McCarthy non
passive investor
33.34 % Marcie McCarthy

33.33% Anthony Moschella

33.33% Michael Moschella

Triple M Supply, LLC
McCarthy invested
$391,000;

McCarthy is non
passive investor
33.34 % Marcie McCarthy

33.33% Anthony Moschella

33.33% Michael Moschella

WoodPal, Ltd.

("WoodPal Ltd.")
Anthony
Moschella testified
that McCarthy
invested $391,000;

McCarthy is non
passive investor
33.34 % Marcie McCarthy

33.33% Anthony Moschella

33.33% Michael Moschella

WoodPal de Mexico

("WoodPal Mexico")
McCarthy testified
that her $391,000
was transferred
from Triple M
Supply to Tijuana
to form WoodPal
Mexico
Mexican entity
WoodPal USA, Inc.

("WoodPal USA")
(record is silent)
Anthony Moschella has a
majority interest 


 The evidence presented to the jury established that the corporate entities were
interrelated, and their history was, at times, complex. With the exception of JTMM,
each of these entities was created in the years 1999 through 2001, the same time
period that Norgips was supplying Triple M Supply with wallboard. With the
exception of Caribe and Caribe I, the entities all shared the same 1000 square foot
office space, telephone system, and computer. 

 Caribe

 The evidence indicated that Caribe, the general partner of Caribe I, was formed
and funded with $150,000 from McCarthy in November 2000 to distribute mulch. 
McCarthy was a non passive investor of Caribe in 2001. (4) At the time of trial,
McCarthy and Michael Moschella still worked together on this enterprise. Although
no partnership agreement was executed, McCarthy and Michael Moschella each
owned equal shares, with McCarthy serving as president and limited partner. 
McCarthy's trial counsel was the initial director of Caribe. 

 Caribe I

 Certificate of Limited Partnership was filed on January 30, 2001. Caribe is the
general partner, and McCarthy and Michael Moschella are limited partners. 

 JTM 

 JTM was doing business as JTMM. On August 17, 1999, $543,105 of
inventory was transferred to the books of Triple M Supply with no evidence of
consideration.

 JTMM

 JTMM was formed in 1995 to install drywall. McCarthy claimed to have no
involvement in JTMM, but received $15,000 in "officer draws" and a $2,688
reimbursement for travel. Anthony Moschella owned 90 percent of JTMM, and his
parents owned the remaining 10 percent. In 1999, after reviewing the financial
statements and the collateral involved, McCarthy hired an attorney to draw up the
paperwork so that she could loan JTMM $150,000. During 1999 to 2000, she
received almost $26,000 in interest payments on her loan. McCarthy testified that
$50,000 of the original loan was never repaid. Based on his review of the accounts
receivable records, Kingston learned that JTMM owed Triple M Supply $120,000. 

 K Cor

 Anthony Moschella, as sole owner, formed K Cor in 1999 to stock wallboard
in houses. Triple M Supply was K Cor's biggest customer. K Cor would pick up the
wallboard and deliver it to a home. Anthony Moschella testified that K Cor stopped
operating in mid-2000 because "[i]t was not worth the hassle to do the work and tend
to the people." K Cor was still in existence, but did not do any business. 

 M Global

 M Global was formed in December 1999 with McCarthy as president and
McCarthy was a non passive investor for 2000 and 2001. It was formed to hire a ship
for one shipment of wallboard for Triple M Supply. There is no proof that the
shipment ever took place, but McCarthy explained that "Michael handled all that
stuff." When asked, McCarthy testified that she did not find it curious that a
company had to be formed to do something for Triple M Supply that Triple M Supply
could have done on its own. 

 Triple M Operating

 Triple M Operating was formed in March 2000 to distribute wallboard. The
Moschellas and McCarthy also owned Triple M Operating in one-third shares. 
McCarthy testified that, despite being 1/3 owner, she was unaware of Triple M
Operating's existence until the filing of this lawsuit. Even after discovering the
entity's existence, she made no inquiries about it. McCarthy was a non passive
investor in 2000.

 Triple M Operating took out a $600,000 loan from Associated Enterprises
Limited just two days before the shipment from Norgips cleared U. S. Customs and
was delivered to Triple M Supply. Anthony Moschella testified that $391,000 of the
$600,000 was used to reimburse McCarthy for the money that she had loaned Triple
M Supply. He further testified that part of the remaining $209,000 was used to pay
off some of Triple M Supply's debts. Triple M Operating sold some of the Norgips
board that belonged to Triple M Supply. All of Triple M Operating's accounts
receivables were pledged to Associated Enterprises. 

 Triple M Operating filed for bankruptcy protection on September 16, 2002. Its
petition listed Associated Enterprises as a $600,000 creditor and Norgips as a
$500,000 disputed creditor. 

 Triple M Supply 

 Triple M Supply was formed in July 1999 as a wallboard distributor and was
owned in one-third shares by Anthony Moschella, Michael Moschella, and Marcie
McCarthy. Anthony Moschella was principally in charge and held the position of
president. McCarthy was vice-president, and Michael Moschella was secretary-treasurer. McCarthy put $391,000 into Triple M Supply and she was a non passive
investor in 1999, 2000, and 2001. Her testimony changed from understanding that
her investment would be lost if Triple M Supply did not survive in contrast to her
same-day testimony that she was entitled to interest on the $391,000 loan that she
gave Triple M Supply. Michael Moschella invested $75,000 in Triple M Supply. 

 Michael Moschella testified that McCarthy was "actively involved" in the
operations of Triple M Supply and "very organized" until late 1999 or early 2000. 
McCarthy received officer's draws, salary, and health insurance as compensation
from Triple M Supply. In 2000 and 2001, she filed tax returns reflecting a non-passive involvement in Triple M Supply. JTMM was Triple M Supply's largest
customer.

 McCarthy was, at one time, making $1,000/week from Triple M Supply. She
testified that she questioned "why one company was paying interest that another
company owed the debt on." She would receive her interest payment for the loans to
JTMM and Triple M Supply in one check. Triple M Supply was paying JTMM's
debts. Despite being morally concerned by Anthony Moschella's conduct, McCarthy
testified that she stayed on as an officer and director until Triple M Supply went out
of business. She admitted that she had check-writing privileges, but never went to
the bank to look at the financial status of the company. She believed that "what you
don't see can't hurt you." 

 Leeland Dykes testified that he introduced some investors, the Fabrianos, to the
Moschellas. The Fabrianos invested $150,000 in Triple M Supply and got a quick
return on their money. They then reinvested their money with the interest that they
had earned, and it "disappeared." (5) 

 Triple M Supply pledged its debts to Mid American Capital Resource Group
without any evidence of consideration. 

 WoodPal Ltd. 

 WoodPal Ltd. was formed in June 2000 as a limited partnership. Its general
partner is WoodPal Materials, Inc. Anthony Moschella testified that he owned the
majority shares and that McCarthy and Michael Moschella were the limited partners. 
Anthony testified that WoodPal Ltd. was more active than WoodPal USA. Anthony
Moschella testified that WoodPal was funded by $391,000 of the $600,000 loan
McCarthy made to Triple M Operating. McCarthy was not reimbursed, and she has
no proof that her money was actually transferred to WoodPal. Anthony testified that
the money came to WoodPal Ltd. after McCarthy had been reimbursed for the
$391,000 that she had loaned to Triple M Supply. WoodPal filed for bankruptcy in
September 2001 and listed Norgips as a "disputed" creditor that was due $500,000. (6) 
McCarthy was a non passive investor in 2000.

 WoodPal Mexico

 McCarthy testified that WoodPal Mexico was a Mexican entity that imported
lumber from Chile to make pallets in Mexico. On January 10, 2000, Anthony
Moschella informed Norgips that he had diverted $150,000 collected from selling
Norgips's wallboard to Mexico for another business venture in which he was
involved--WoodPal Mexico. Klubak loaned WoodPal $250,000 and feels as though
the Moschellas took advantage of him. Anthony Moschella told him that they were
"shutting down" WoodPal because they were not making money. 

 WoodPal USA

 WoodPal USA was formed in 2000 to "import lumber to make pallets." 
WoodPal is equally owned by the Moschellas and McCarthy. It was created to ease
the transfer of money from WoodPal Mexico to the United States. McCarthy testified
that she was told that "the purpose of WoodPal USA being set up was solely to get
back [her] money out of WoodPal Mexico." McCarthy testified that she invested "a
couple hundred thousand more" in WoodPal, but claims that, despite having invested
almost $600,000 in it, she was unaware that it had filed bankruptcy. 

Lawsuit

 Norgips brought suit alleging fraud, negligent and intentional
misrepresentation, conversion and violation of the Texas Theft Liability Act, breach
of contract, suit on a sworn account, suit on a guaranty, unfair competition, tortious
interference with contractual and prospective business relations, and piercing the
corporate veil. The suit was brought against Triple M Supply, LLC, Triple M
Operating, Ltd., JTMM Construction, Inc., Anthony Moschella, Michael Moschella,
Marcie McCarthy, Woodpal USA, Inc., and Woodpal DeMexico, SA de C.V. Before
trial, Triple M Supply, Triple M Operating, the Moschellas, (7) and Woodpal filed for
bankruptcy relief, and Norgips non-suited JTMM. Norgips later added Steve Klubak
as a defendant and received summary judgment against him. The actions against
Klubak and the Moschellas were severed. 

 The case proceeded to trial against Marcie McCarthy. During trial, Bryne
Liner, a certified public accountant and certified fraud examiner, testified that a fraud
investigation involves looking for, among other things, the flow of money, the
relationship between the parties, a lot of "red flags," a lot of related party
transactions, a lot of self dealing, and lack of documentation. Liner testified that he
found broad categories of patterns in this case:

 Broad patterns. Accounting for inventory issues were all over the place. 
Inventory should be positive. They're negative. The movement of
inventories between companies. The relationships between the parties
via JTMM, Triple M Supply, Triple M Operating, Woodpal, the
movement of monies, officer's draws. Just a constant common theme
between all the companies with respect to the players inside of those
companies. . . . One of the issues we found in this case is, you know,
they talk about loans or lack of loan documentation and we made a loan
but we have nothing to support it. In some cases I couldn't find support
for the loan. Where did the money go? There is this discussion about
$600,000.00 to the Isle of Man. I didn't see a note nor did I see that
$600,000.00 gone. The fact that $391,000.00 was repaid from one
company to another company just out of the goodness of that company's
heart, well, that's not how companies work. When you give up
something you have to have consideration or value coming back to you. 
So there is a lot of overlapping lines inside of these companies and it's
hard to distinguish this company from this company from this company
with respect to the inner relationships that are going on throughout the
documents that I looked at.


Liner was concerned about numerous inconsistencies between the bank records,
financial records, and tax returns. He testified that the records indicate that Triple M
Operating was receiving Norgips's wallboard from Triple M Supply without giving
any consideration in return. He was surprised to see on JTMM's ledger that
McCarthy received $15,000 in officer draws despite not being listed as an officer and
despite her asserted lack of involvement in JTMM. He testified that it was curious
that McCarthy received director's fees from Triple M Supply despite her refusal to
attend the board meetings. Liner questioned, "What's the value being traded?" Liner further testified that it was "very important" to note that, on her taxes, 
McCarthy was designated as a non passive investor in several of her companies. He
explained that IRS literature outlines 12 factors to consider when designating an
investor as a non passive one. One such factor is whether the investor has 500 hours
of involvement in the company. This level of involvement alerts the IRS that the
investor is involved in the affairs of the business. A CPA is required to explore this
designation before attesting to its inclusion on a tax return. 

 McCarthy's tax returns indicate that she was a non passive investor for Triple
M Supply in 1999 and a non passive investor for Triple M Supply, Triple M
Operating, M Global Shipping, and Woodpal, Ltd. in 2000. McCarthy testified that
she was unaware of Triple M Operating's existence until this case was filed--this,
despite the fact that, one year earlier, her tax returns reflected that she was a non
passive investor in that very company. In 2001, McCarthy was a non passive investor
of Triple M Supply, M Global Shipping, and Caribe Forest Products.

 Liner testified that he was concerned about money going in and out of
companies on the same day. "There is no real boundaries between these entities. 
Even though they're different legal entities, it's sort of like an invisible checkbook." 
Looking at the financials, Liner testified that "it has the appearance as though it's one
big pile of money." Liner summarized his findings as follows:

 You've got multiple companies that are intermingling. You've got
monies coming in, monies coming out. You have a lack of
documentation. You've got a lack of supporting information. So it
becomes an accounting nightmare to say is this a legitimate transaction
or not because of the condition or the lack of documentation. You've
got transfers between parties. You've got a lot of red flags. You've got
monies coming in, monies coming out, same day, same transfer. You
are kind of, what in the world is going on? You've got inventories that
are being shifted and moved. 


When Liner was asked if this was all evidence of a fraudulent scheme, he responded,
"I think with respect to the finding of fraud, that's something for the jury to decide." 
 The jury was asked only two questions: (1) did McCarthy cause Triple M
Supply to be used to perpetrate an actual fraud and did perpetrate an actual fraud
upon Norgips, primarily for her own direct benefit and (2) what sum of money would
compensate Norgips for the conduct found in answer one for unpaid Norgips
wallboard invoices and attorney's fees. The jury affirmatively answered the first
question and found that Norgips was entitled to $541,850.32 for unpaid wallboard
invoices and $52,000 for attorney's fees.

Charge Error 

 In issue one, McCarthy argues that the trial court erred in submitting an
incorrect definition of "actual fraud" in the jury charge. 


Standard of Review

 In all jury cases, the trial court must submit instructions and definitions to
properly enable the jury to render a verdict. Tex. R. Civ. P. 277. A valid instruction
must: (1) assist the jury, (2) accurately state the law, and (3) find support in the
pleadings and evidence. Union Pac. R.R. v. Williams, 85 S.W.3d 162, 166 (Tex.
2002). The trial court has considerable discretion in deciding what instructions are
necessary and proper in submitting issues to the jury. State Farm Lloyds v. Nicolau,
951 S.W.2d 444, 451 (Tex. 1997). Therefore, we will not disturb the trial court's
decision on which instructions to submit to the jury absent an abuse of discretion. Id.
at 452.

Actual Fraud 

 The trial court's charge included the following question to the jury that
included each element of the "veil piercing" provision in article 2.21, section A(2) of 
the Texas Business Corporation Act:

Did Marcella McCarthy cause Triple M Supply, LLC to be used to
perpetrate an actual fraud, and did perpetrate an actual fraud upon
Norgips, primarily for her own direct personal benefit?


Answer: [Yes]


The charge also included the following definition of "actual fraud":


 For the purposes of this charge, "actual fraud" occurred if:


 

 Triple M Supply concealed or failed to disclose a
material fact within the knowledge of Triple M
Supply; 



 2. Triple M Supply knew that Norgips was ignorant of
the fact and did not have an equal opportunity to
discover the truth;

 

 3. Triple M Supply intended to induce Norgips to take
some action by failing to disclose the fact; and 


 4. Norgips suffered injury as a result of acting without
knowledge of the undisclosed fact.


See Tex. PJC § 105.4.

 

On appeal, McCarthy complains that the language concerning actual fraud
contained in the charge was defective because it did not require a finding of a
material misrepresentation.

The trial court overruled McCarthy's objection and stated as follows:

 The objection to PJC 105.4 of the fraud instruction, I am overruling the
objection based on the discussions I've had with Counsel off the record
prior to the final charge conference in which Plaintiffs elect to proceed
on a theory of active concealment of material facts which the Pattern
Jury Charge tells me may also be actionable as false statements. I
believe that comports with the requirement.


We agree with the trial court that actual fraud can be the concealment of material
facts or the failure to disclose a material fact. See Custom Leasing, Inc. v. Texas
Bank & Trust Co., 516 S.W.2d 138, 142 (Tex. 1974). Accordingly, the trial court did
not abuse its discretion by submitting a definition in accordance with the theory of
Norigips's case. 

Duty to Disclose

 We construe McCarthy's issue on appeal as arguing that the definition of fraud
submitted to the jury was incorrect because it is only appropriate when there is a legal
duty to disclose. As a general rule, a failure to disclose information will constitute
fraud when there is a duty to disclose the information. Bradford v. Vento, 48 S.W.3d
749, 755 (Tex. 2001). Thus, silence may be equivalent to a false representation when
the particular circumstances impose a duty on the party to speak and he deliberately
remains silent. Id. Whether a duty exists is a question of law. Id. Several courts of
appeals have held that a general duty to disclose information may arise in an arm's-length business transaction when a party makes a partial disclosure that, although
true, conveys a false impression. See, e.g., Citizens Nat'l Bank v. Allen Rae Invs., 142
S.W.3d 459, 476-77 (Tex. App.--Fort Worth 2004, no pet.); Hoggett v. Brown, 971
S.W.2d 472, 487 (Tex.App.-- Houston [14th Dist.] 1997, no writ); Ralston Purina
Co. v. McKendrick, 850 S.W.2d 629, 636 (Tex.App.--San Antonio 1993, writ
denied).

 The jury was not instructed about whether McCarthy had a duty to disclose. 
However, McCarthy's issue on appeal regarding her duty to disclose was not properly
preserved at trial. See Tex. R. App. P. 33.1. McCarthy's attorney objected to the
proposed definition of actual fraud and the omission of a question concerning
McCarthy's duty as follows:

 In question Number 1 the Court requests whether or not Marcie
McCarthy caused Triple M Supply to be used to perpetrate actual fraud
and the definition is for concealment or failure to disclose material facts.
The evidence is clear that Triple M Supply has no duty. It's not a
fiduciary or has any other duty and therefore this is an incorrect charge.
Actual fraud should be defined as actual fraud contained in the Pattern
Jury Charge. 


 I object to the charge [on] concealment because there is no duty
to disclose. In addition, there is no question to the jury concerning
fiduciary duty or establishing a duty to disclose under the statutes or
common law. 


A party is required to request and tender to the trial court a substantially correct
instruction in writing when the trial court omits the instruction from the jury charge.
Tex. R .Civ. P. 278; Yellow Cab and Baggage Co. v. Green, 277 S.W.2d 92, 93 (Tex.
1985). If a party fails to do so, any error by the trial court in not submitting the
instruction to the jury is waived. Jarrin v. Sam White Oldsmobile Co., 929 S.W.2d
21, 25 (Tex. App.--Houston [1st Dist.] 1996, writ denied). Although she objected
to the omission of a duty instruction in the charge, McCarthy did not submit a written
instruction regarding duty for the trial court's consideration. Rule 278 of the Texas
Rules of Civil Procedure provides, in part:

 Failure to submit a definition or instruction shall not be deemed a
ground for reversal of the judgment unless a substantially correct
definition or instruction has been requested in writing and tendered by
the party complaining of the judgment. 


Tex. R. Civ. P. 278.

 We hold that the trial court did not abuse its discretion in submitting the 
definition of actual fraud in the jury charge. Accordingly, we overrule issue one. 

Sufficiency of the Evidence

 In issues two, three, and six, McCarthy contends that the evidence was legally
insufficient to support the jury's findings that (1) Triple M Supply committed an
actual fraud, (2) Norgips suffered $541,850 in damages as a result Triple M Supply's
and McCarthy's conduct, and (3) Norgips incurred reasonable and necessary
attorney's fees in attempting to collect payment from Triple M Supply. In issue five,
McCarthy argues that the evidence was legally and factually insufficient to support
the jury's finding that she caused Triple M Supply to be used to perpetrate an actual
fraud, and did perpetrate an actual fraud upon Norgips, primarily for her own direct,
personal benefit. 

Standard of Review

 In reviewing a "no evidence" issue, we must view the evidence in a light that
tends to support the finding of the disputed fact and disregard all evidence and
inferences to the contrary. Weirich v. Weirich, 833 S.W.2d 942, 945 (Tex. 1992). If
more than a scintilla of evidence exists to support a finding, a no-evidence challenge
fails. KMG Kanal-Muller-Gruppe Deutschland GMBH & Co. KG v. Davis, 175
S.W.3d 379, 393 (Tex. App.--Houston [1st Dist.] 2005, no pet.). More than a
scintilla of evidence exists if the evidence furnishes some reasonable basis for
differing conclusions by reasonable minds about a vital fact's existence. Id. 

 In reviewing a factual sufficiency complaint, we must first examine all of the
evidence. Lofton v. Texas Brine Corp., 720 S.W.2d 804, 805 (Tex. 1986). Having
considered and weighed all the evidence, we should set aside the verdict only if the
evidence is so weak, or the finding is so against the great weight and preponderance
of the evidence, that it is clearly wrong and unjust. Cain v. Bain, 709 S.W.2d 175, 176
(Tex. 1986). We cannot merely substitute our opinion for that of the trier of fact and
determine that we would reach a different conclusion. Hollander v. Capon, 853
S.W.2d 723, 726 (Tex. App.--Houston [1st Dist.] 1993, writ denied). Actual Fraud

 In issue two, McCarthy contends that the evidence was legally insufficient to
support a finding that Triple M Supply: (1) concealed a material fact within its
knowledge, (2) knew that Norgips was ignorant of the fact and did not have an equal
opportunity to discover the truth, (3) intended to induce Norgips to take some action
by failing to disclose the fact, and (4) caused injury to Norgips as a result. We hold
that there is legally sufficient evidence to support the jury's implied affirmative
finding. (8) 

 Triple M Supply misrepresented to Norgips that a lien on Triple M Supply's
receivables could and would be executed to ensure that Norgips would get paid. At
the time that Triple M Supply made this misrepresentation, all of its receivables and
stock were already pledged to other creditors. One such creditor was McCarthy, who
was pledged JTMM's assets. Klubak testified about a meeting during which Anthony
Moschella promised to pledge the receivables to Norgips. Triple M Supply also did
not disclose to Norgips that only the older accounts, which were least likely to be
collected, were held by Triple M Supply, while all the paying accounts had been
transferred to Triple M Operating.

 Norgips was not told that, starting in July 2000, Triple M Supply stopped
invoicing its customers who bought Norgips wallboard. Nor was it told that all of
Triple M Supply's assets had been transferred to Triple M Operating. No one from
Triple M Supply disclosed this information to Norgips. 

 Norgips was not informed of and did not have an opportunity to discover these
material facts about the way Triple M Supply was operating. There was no UCC
filing done to put others on notice of the $600,000 loan before Norgips cleared the
shipment with U.S. Customs. The loan was arranged through an entity in the Isle of
Man. (9) Norgips also could not verify the truth of Triple M Supply's aging reports that
were presented by the Moschellas. These reports appeared to show performing
accounts whose payments should have been used to pay Norgips's debt, but were not. 
Triple M Supply also did not disclose and Norgips had no opportunity to discover
that Triple M Operating had begun distributing its wallboard and was the entity to
whom all of the performing accounts had been transferred. 

 Triple M Supply, with assistance from Klubak, concealed this information
because it was trying to "corner the market" for wallboard in Texas. In the summer
of 2000, with Klubak's assistance and despite having one-half a shipload of
wallboard remaining from the Norgips shipment, Triple M Supply was also buying
wallboard from a west coast supplier. Texas was experiencing a shortage of
wallboard, and Triple M Supply wanted to buy more wallboard and sell it at a
premium. Kingston terminated Klubak's employment when he learned of these
transactions and of his divided loyalties. 

 As a result of Triple M Supply's concealment of these material facts, Norgips
was induced to manufacture and transport an entire shipload of wallboard to Houston
based on Triple M Supply's purchase order, and it continued to make periodic
deliveries of wallboard to Triple M Supply, for which it was never fully compensated. Viewing the evidence in a light that tends to support the implied finding of
actual fraud, we hold that there is legally sufficient evidence to support the jury's
implied affirmative finding. As such, we overrule issue two.

Damages

 In issue three, McCarthy contends that the evidence was legally insufficient to
support a finding that Norgips suffered $541,850 in damages as a result of the fraud
of Triple M Supply or the conduct of McCarthy. We hold that there is legally
sufficient evidence to support the jury's finding.

 With regard to the damages sustained by Norgips, the trial court's charge
included the following instruction:

 Consider the following elements of damages, if any and none other.


 (1) The difference between the value of the Norgips
wallboard that Triple M Supply, L.L.C. received and
the amount of money that Triple M Supply L.L.C.
paid to Norgips for that wallboard.

. . . .


Do not add an amount for interest on damages, if any.


Answer in dollars and cents for damages, if any, for the

following elements only:


 (1) Unpaid Norgips wallboard invoices:


 Answer: $(541,850.32) 

Kingston testified that the total value for the wallboard sold to Triple M Supply was
$1,047,000. Of that amount, Triple M Supply only paid $504,800, leaving an unpaid
balance of $541,850. (10) At trial, and as noted by McCarthy in her briefing to this
Court, Anthony Moschella agreed that "Triple M Supply has not paid to Norgips the
amount of $541,850.32 and that amount is owed to Norgips." Furthermore, Klubak
testified that he was aware that the Moschellas received and used Norgips's board
without paying for it. 

 We hold that there was legally sufficient evidence to support the finding that
Norgips was owed $541,850.32 in unpaid wallboard invoices. Accordingly, we
overrule issue three.

Attorney's Fees

 In issue six, McCarthy contends that the evidence was legally insufficient to
support the jury's finding that Norgips incurred $52,000 as its "reasonable and
necessary attorney's fees . . . in attempting to collect payment from Triple M Supply,
Inc." We hold that there is legally sufficient evidence to support the jury's finding.

 Norgips's attorney testified that Norgips incurred $39,000 in attorney's fees
and slightly less than $15,000 in expenses from the time that Norgips initiated this
suit until Triple M Supply filed for bankruptcy. McCarthy complains, however, that
Norgips's attorney "gave no testimony on the issue of reasonable and necessary
attorney's fees expended 'in an attempt to collect payment from Triple M Supply' as
Question No. 2 requested." McCarthy further argues that, because there were
numerous defendants before the various bankruptcy filings, non-suit, and summary
judgment, the charge question should have segregated "attorney's fees to the various
Defendants." 

 Norgips's attorney testified that his fees were reasonable and necessary. He
explained that, "[i]t's a fairly complicated situation, as you've come to learn in the
past few days, and it took a while for us to unravel and begin to understand the
interrelationships of these entities." On cross-examination, McCarthy's attorney
questioned him regarding the actual fees that would have been incurred had Triple M
Supply been the only defendant. Norgips's attorney responded, "that's sort of a
factually intensive . . . question. Every circumstance is a little different." During the
charge conference, McCarthy objected to the submitted charge, and the following
exchange occurred:

 McCarthy: I object to Question Number 2 - 2 - subpart 2 on the
reasonable and necessary expenses Norgips expended in
attempting to collect as Counsel in his testimony did not
segregate the attorney's fees between collecting from
Triple M, Inc. and the other six Defendants that were sued
in the original petition in this case. As a result that
question should not be asked and there is no evidence to
support same.


 Court: Response, Counsel?


 Norgips: Your Honor, we, under our theory of the case, are
presenting attorney's fees as a component of the fraud
damage question being submitted to the jury, the fraud
committed by Ms. McCarthy that we allege is part of a
fraudulent scheme involving all of these entities. As a
result, we don't believe we had a duty to segregate and
isolate our claims, only as to Triple M Supply. Even had
we done so, the fees were so intertwined as to become
indistinguishable one from the other. And the testimony,
finally, supported that under [McCarthy's] theory. Had we
proceeded to obtain a summary judgment only against
Triple M Supply and no other entity, we would still have
gone through the same amount of labor and expense in
order to reach that result given that it would have required
taking the deposition at a minimum of Anthony Moschella.


 Court: I'm going to overrule the objection. I believe the question
as phrased permits both parties to present their arguments
to the jury on that--on that issue and I believe that's where
the responsibility for determining what, if any, attorney's
fees were reasonable and necessary as incurred by Norgips,
I believe that responsibility lies with the jury.


 We agree with the trial court that, in this case, the jury was responsible for
determining the amount of reasonable and necessary attorney's fees. Based on the
record presented, we hold that there is legally sufficient evidence to support the jury's
award of attorney's fees, and we overrule issue six.

Piercing the LLC Veil

 In issue four, McCarthy argues that there was legally and factually insufficient
evidence to support the jury's finding that she caused Triple M Supply to be used to
perpetrate an actual fraud and did perpetrate an actual fraud upon Norgips, primarily
for her own direct personal benefit. As a result of this finding, Norgips was able to
pierce the LLC veil around Triple M Supply and recover damages from McCarthy,
individually.

 The evidence showed that McCarthy had contributed $391,000 to Triple M
Supply as a start-up business. McCarthy was aware of the fraudulent business
practices of Anthony Moschella, including using one entity to pay another's bills. 
She did nothing to stop these practices. Furthermore, she accepted interest payments
on her loan and ultimately received repayment in full, at the expense of Norgips and
other creditors. The evidence presented at trial showed that the fraudulent operation
of Triple M Supply simply would not have been possible without McCarthy's
contributions. 

 McCarthy testified that her involvement in the daily affairs of Triple M Supply
stopped in late 1999 or early 2000. She did not regularly attend board meetings and
claimed to be unaware of Triple M Supply's purchase agreement with Norgips and
the existence of Triple M Operating until after this suit was instituted. She received
her last officer's check in April 2000, shortly before Triple M Supply took delivery
of Norgips's wallboard. 

 McCarthy was an equal participant and director in most of the entities that
participated in defrauding Norgips. The fraudulent conduct would not have been
possible without McCarthy's infusion of capital into Triple M Supply. Triple M
Supply was organized as a Texas Limited Liability Company ("LLC") about six
weeks after McCarthy's contribution of "seed money." There was no evidence that
Triple M Supply executed a promissory note or that this was, in fact, a capital
contribution. Triple M Operating borrowed $600,000--$391,000 of which was used
to repay McCarthy's "loan." Even though the repayment to McCarthy was diverted
through another entity, McCarthy was made whole at the expense of Norgips, who
was owed more than $540,000 by Triple M Supply. McCarthy received health
insurance, a salary, officers' draws, and interest payments as compensation for being
an owner of Triple M Supply. Furthermore, McCarthy was aware of the fraudulent
manner in which Triple M Supply was being managed. She admitted that she knew
Triple M Supply was paying the debts of other companies. McCarthy willingly
received substantial interest payments on her loans despite her knowledge of Anthony
Moschella's fraudulent business practices. 

 Because there was legally and factually sufficient evidence to support the jury's
finding, we overrule issue four.

Individual Liability 

 In issue five, McCarthy argues that the trial court erred in finding her liable for
Triple M Supply's debt because, pursuant to the Texas Limited Liability Company
Act ("TLLCA"), a member of a Texas limited liability company ("LLC") is liable in
very limited circumstances and, specifically, not for a debt. Tex. Rev. Civ. Stat.
Ann. art. 1528n, § 4.03(A) (Vernon 2006). McCarthy argues that because the
TLLCA does not address whether or under what circumstances a litigant may
"pierce" the veil of an LLC for corporate debt, the veil is impenetrable. We disagree. 
 Generally, members are not individually liable for the debts of the LLC. (11) The
TLLCA provides in pertinent part that: "Except as and to the extent the regulations
specifically provide otherwise, a member or manager is not liable for the debts,
obligations or liabilities of a limited liability company including under a judgment
decree, or order of a court." Tex. Rev. Civ. Stat. Ann. art. 1528n, § 4.03(A)
(Vernon 2006). The TLLCA does not address whether or under what circumstances
a litigant may "pierce" the corporate veil of an LLC in order to hold a member liable
for a debt of the LLC. Id.

 However, Texas courts and other jurisdictions, have applied to LLCs the same
state law principles for piercing the corporate veil that they have applied to
corporations. See e.g. Pinebrook Props., Ltd. v. Brookhaven Lake Prop. Owners'
Ass'n, 77 S.W.3d 487, 499 (Tex. App.--Texarkana 2002, pet. denied) (applying
corporate alter ego veil piercing precedent in analyzing plaintiff's attempts to pierce
veil of LLC); In re Secs. Inv. Prot. Corp. v. R.D. Kushnir & Co., 274 B.R. 768,
775-76 (Bankr. N.D. Ill. 2002) (concluding that, while Illinois LLC Act precludes
piercing on basis of failure to follow formalities, nothing in statute bars piercing LLC
veil on other grounds applicable to corporations); Hamilton v. AAI Ventures, L.L.C.,
768 So.2d 298, 302 (La. App. 2000) (applying corporate veil piercing principles in
upholding trial court's piercing of LLC veil to hold member liable on LLC contract);
Kaycee Land & Livestock v. Flahive, 46 P. 3d. 323, 327 (Wyo. 2002) (holding that,
while Wyoming LLC Act was silent as to veil piercing, there was no policy or legal
reason to treat LLCs different from corporations in this regard; when LLC has caused
damage and has inadequate capitalization, co-mingled funds, diverted assets, or used
LLC as a mere shell, individual members are immune from liability. Legislative
silence cannot be stretched to condone such an illogical result.). McCarthy has not
offered, nor can we find, any judicial support for the proposition that existing state
law doctrines of piercing the corporate veil should not be applied to LLCs.

 Texas courts have disregarded the corporate fiction and pierced the corporate
veil when the corporate form has been used as part of an unfair device to achieve an
inequitable result. See Castleberry v. Branscum, 721 S.W.2d 270, 272 (Tex. 1986),
superseded in part by statute, Tex. Bus. Corp. Act Ann. art. 2.21(Vernon Supp.
2005). Specifically, courts have disregarded the corporate form when it is used as a
sham for perpetrating a fraud. Id.

 Here, the trial court did not err in its application of law. The jury found that
McCarthy used an LLC as a sham to perpetrate a fraud, and the trial court applied this
finding to pierce the corporate veil of the LLC. The jury found that McCarthy used
Triple M Supply LLC to perpetrate actual fraud and did perpetrate actual fraud upon
Norgips primarily for McCarthy's own direct personal benefit. (13)
 As shown above,
there was evidence presented at trial that McCarthy and her two partners (1) used
Triple M Supply as a front to borrow funds and order wallboard on credit from
Norgips and others; (2) diverted to themselves and to entities in which McCarthy had
either an ownership and/or financial interest, proceeds due to Triple M Supply
through the use of complex and undocumented financial transactions and the
commingling of inventory and bank accounts; and (3) left Triple M Supply
undercapitalized and unable to pay its creditors.

 McCarthy had a direct ownership and/or financial interest in each of the entities
that benefitted from sums due to Triple M Supply: JTMM, M Global, Triple M
Operating, and Woodpal. Funds and inventory of these companies were intermingled
without documentation, as evidenced by Anthony Moschella's frequent financial
transfers among the various entities. Funds from Triple M Supply were being used
to pay the debt of JTMM. Triple M Operating was paying the debts of Triple M
Supply. After a checking account for Triple M Supply was opened, large sums of
money were transferred out of Triple M Supply's bank account to several related
businesses including K-Cor Supply and JTMM. Additionally, over $500,000 of
inventory was switched "on the books" from JTMM Supply to Triple M Supply
without any further documentation between the two companies. Triple M Supply was
then loaded with debt and subsequent creditors, including Norgips, were not paid
back. McCarthy, however, was paid. This was the case even though significant
deposits were made to Triple M Supply from customer payments from the sale of
Norgips's wallboard. As a result of these acts, Triple M Supply was left
undercapitalized and without sufficient funding to pay its debts. 

 Accordingly, we hold that the trial court did not err in finding McCarthy liable
on Triple M Supply's debt. As such, we overrule issue five.

Conclusion


 We affirm the trial court's judgment.

 

 George C. Hanks, Jr.

 Justice


Panel consists of Justices Jennings, Hanks, and Higley.


Justice Jennings, dissenting.






 

1. These accounting records were admitted into evidence with the limiting instruction
that they were not offered to prove the truth of the information contained therein, but
simply to show what Anthony Moschella had provided the records to Norgips at the
meeting.
2. Anthony Moschella owned 90 percent of JTMM, and his parents owned the remaining
10 percent.
3. The same evidentiary restriction was placed on the jury's consideration of this second
set of records--accounts receivables--they were not admitted to prove the truth of the
information contained therein. 
4. McCarthy represented on her personal tax returns that she was a "non-passive"
investor in various business entities alleged to have been involved in the fraud against
Norgips. To be classified as a "non-passive" investor, a person must represent to the 
Internal Revenue Service, among other things, that they spent more than 500 hours
working in the business during the tax year. 
5. Dykes testified that the Fabrianos sued him, and he was found liable for their
$150,000 investment. 
6. Norgips was also listed as a $500,000 creditor on Anthony Moschella's personal
bankruptcy filing. 
7. Michael Moschella filed for bankruptcy the morning of trial. 
8. The court's charge did not ask the jury to make a separate finding of actual fraud. 
However, the jury's affirmative answer to question number one, by which Norgips
was able to pierce the LLC veil as to Triple M Supply, implies a finding of actual
fraud on the part of that company. See Tex. R. Civ. P. 276.
9. Liner testified that he read an article prepared by the FBI explaining that the Isle of
Man has a reputation "for being a tax haven or a place to money launder
transactions." 
10. The exact numbers submitted to the jury by way of exhibit were as follows: sales of
$1,046,652.16; collected $504,801.84; leaving a balance of $541,850.32. 
11. A limited liability company is any company organized and in existence in conformity
with the TLLCA. Tex. Rev. Civ. Stat. Ann. art. 1528n, § 1.02(A)(3) (Vernon
2005). (12)
12. Until 2010, the Texas Limited Liability Company Act ("the Act") governs a domestic
LLC formed prior to January 1, 2006.(CITE) 
 
 
13. Article 2.21, which is specifically applicable to traditional corporations, provides for
piercing the corporate veil where there is a finding that the shareholder "caused the
corporation to be used for the purpose of perpetrating and did perpetrate an actual
fraud on the obligee primarily for the direct personal benefit of the" shareholder. See
Tex. Bus. Corp. Act Ann. art. 2.21(A)(3) (Vernon Supp. 2005).